THERESE L. INGRASSIA, Plaintiff-Appellant, v. DAVID A. INGRASSIA, Defendant (Dan Walker, Jr., Petitioner-Appellee).—*In re* MARRIAGE OF THERESE L. INGRASSIA, Petitioner-Appellant, and DAVID A. INGRASSIA, Respondent-Appellee.

Second District   Nos. 2—86—0461, 2—86—0462 cons.

Opinion filed June 10, 1987.

Francis X. Riley, Attorney at Law, of Wheaton, for appellant.

Dan Walker, Jr., of Oak Brook, *pro se*, and Peter Alexander, of Alexander & Cicero, P.C., of Rockford, for appellee.

PRESIDING JUSTICE LINDBERG delivered the opinion of the court:

Plaintiff, Therese L. Ingrassia, appeals from two orders of the circuit court of Winnebago County in a post-judgment proceeding arising from the 1975 dissolution of her 11-year marriage to defendant, David A. Ingrassia. One appeal (No. 86—462) is from an order of the trial court terminating maintenance and setting a ceiling on defendant's financial obligations under the settlement agreement provision requiring defendant to provide their daughter, Jacqueline, with a college education. The other appeal (No. 86—461) is from an order requiring plaintiff to pay $9,730.08 in attorney fees to attorney Dan Walker, Jr. The two appeals were consolidated for review by this court. We affirm in No. 2—86—0462 and reverse and remand in No. 2—86—0461.

Although the record and the appellant (Therese L. Ingrassia) are the same in the two appeals, the issues raised and the appellees (David A. Ingrassia in No. 2—86—0462 and Dan Walker, Jr., in No. 2—86—0461) are distinct. The two appeals will, therefore, be considered separately, starting with No. 2—86—0462.

That appeal is from the order terminating maintenance and setting a ceiling on defendant's financial obligations under the college education provision of the settlement agreement. Many of the facts relevant to this appeal were set out in our opinion deciding a prior case between these same parties. (*In re Marriage of Ingrassia* (1986), 140 Ill. App. 3d 826, 489 N.E.2d 386.) It is, therefore, unnecessary to set forth the facts in detail here. We will note the facts relevant to the issues raised when the particular issues are discussed.

It is difficult to pinpoint the issues plaintiff is raising, especially with respect to the termination of maintenance. Her statement of the issues is not very closely related to her points, and her precise contention is not always clear from her argument. From an examination of her brief and reply brief, it appears that the best summary of the issues is her statement of the issues, which reads:

"a. A settlement contract providing for maintenance is conclusive on the parties to the contract. It is subject to change or termination only by its terms; absent fraud, unconscionability, coercion, violation of law, public policy or morals.

b. The contract entered into by these parties was subject to termination by its terms, not by operation of law on this Record.

c. The provision for the college education for the daughter of the parties falls far short of equitable measures statutorily required, given the quality, talent and industry of the daughter and the ample means of the defendant.

d. The want of impartiality by the trier of fact deprived the plaintiff of due process of law."

None of these issues warrants reversal.

Primarily, plaintiff's first two issues depend upon her having a contract right to maintenance unmodifiable except by the terms of the 1975 settlement agreement. She has no such right, and the maintenance she received was modifiable.

The applicable provisions of the settlement agreement provide:

"2. ALIMONY, That the Husband shall pay to the Wife for Alimony the sum of $750.00 per month. The Husband agrees to waive any and all right to alimony, past, present and future.

* * *

4. AGREEMENT WITH RESPECT TO THE PAYMENT OF ALIMONY AND CHILD SUPPORT. That the Wife and Husband agree that, from the date of the execution of this Agreement, there shall be a 5-year moratorium with respect to the provisions outlined herein regarding the payment of alimony and child support on the part of the Husband. During this 5-year

period of time there shall be no attempts by either party to alter, either by increase or decrease, the amount of alimony and child support payments outlined herein except that in the event of the Wife earning in excess of $15,000.00 in the course of her employment in any one calendar year, the Wife ceasing to live within the State of Illinois or the remarriage of the Wife. In the event of the remarriage of the Wife, the amount of child support payments by the Husband for the minor child shall be subject to modification through renegotiation or court action. Likewise, in the event that the Wife moves out of the State of Illinois or earns in excess of $15,000.00 in her occupation in any given calendar year, the amount of alimony and child support payments shall be subject to modification through renegotiation or court action.

\* \* \*

10. SECURITY FOR ALLOWANCE, SUPPORT AND RELATED MATTERS. That the Husband agrees to provide $30,000.00 term life insurance on his life with the Wife as beneficiary, to secure the payments undertaken to be made by the Husband, until the Wife remarries or reaches the age of 65."

The interpretation of these provisions is straightforward. Modification of maintenance and child support is specifically precluded for five years, unless plaintiff earns more than $15,000 in one calendar year, ceases to live in Illinois, or remarries. The provision of a five-year moratorium, with specified exceptions, for modification of child support and maintenance indicates that those obligations are to be more generally modifiable after that time, since otherwise such a provision would be unnecessary and would make no sense. Contrary to plaintiff's contentions, the security provision is of no significance to the modifiability of maintenance. It requires a life insurance policy on defendant to secure those payments defendant has undertaken, until plaintiff remarries or reaches age 65. It clearly does not set a time period during which maintenance is to be paid. We, thus, conclude that the terms of the settlement agreement contemplated that maintenance would be generally modifiable after five years.

This is consistent with the way maintenance has previously been treated in this case. The settlement agreement required defendant to pay $250 child support and $750 maintenance each month. In 1984, on plaintiff's petition, the trial court modified this to $1,700 per month unallocated child support and maintenance. (*In re Marriage of Ingrassia* (1986), 140 Ill. App. 3d 826, 827-30, 489 N.E.2d 386, 387-89.) The maintenance and child support obligations have thus been treated as

generally modifiable after the five-year moratorium.

Plaintiff seems to object to the trial court's use of factors in the current maintenance statute in modifying her maintenance. (Ill. Rev. Stat. 1985, ch. 40, par. 504.) It seems that her objection has to do with modifying the maintenance she received under the 1975 settlement agreement, which was incorporated into the 1975 judgment, on the basis of a statute effective in 1977. There is no merit to this objection.

First, the provisions of the 1975 settlement agreement, which the 1975 judgment incorporated, regarding child support and maintenance were not the ones at issue in the case at bar. It was the 1984 order which was modified, not the 1975 judgment, and the 1984 order was entered after the 1977 effective date of the statute. Second, a provision of the statute provides that it "applies to all proceedings commenced after its effective date for the modification of a judgment or order entered prior to the effective date of this Act." (Ill. Rev. Stat. 1985, ch. 40, par. 801(c).) Since the proceeding at bar for modification was commenced long after the 1977 effective date of the act, there can be no question that it is applicable to this case.

■ Under the statute, maintenance provisions may be modified "only upon a showing of a substantial change in circumstances." (Ill. Rev. Stat. 1985, ch. 40, par. 510(a).) Plaintiff in her reply brief claims that this provision is not involved in this case; that defendant sought "termination" of maintenance, which is governed by a separate provision. (Ill. Rev. Stat. 1985, ch. 40, par. 510(b).) This is utterly without merit. It is apparent from the record of the proceedings below that defendant in his counterpetition was claiming a substantial change in circumstances justified terminating (modifying to zero) maintenance, and it is apparent that the court and the parties tried the case on the substantial-change-in-circumstances theory. Moreover, a termination is consistent with modification in the maintenance context. The statutory provision on termination cited by plaintiff is one providing for automatic termination of maintenance under certain conditions. (Ill. Rev. Stat. 1985, ch. 40, par. 510(b).) The "change in circumstances" provision is a more general modification provision. (Ill. Rev. Stat. 1985, ch. 40, par. 510(a).) Since maintenance may be for a definite period of time (Ill. Rev. Stat. 1985, ch. 40, par. 504(b)), there is nothing inconsistent with declaring maintenance at an end on a particular date and an order for modification of "the provisions of any judgment respecting maintenance or support." (Ill. Rev. Stat. 1985, ch. 40, par. 510(a).) Thus, the termination is permitted under the modification provisions of section 510(a) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1985, ch. 40, par. 510(a)). *In re Marriage of Henzler*

(1985), 134 Ill. App. 3d 318, 322-23, 480 N.E.2d 147, 150 (in a case controlled by section 510(a) (Ill. Rev. Stat. 1985, ch. 40, par. 510(a)), appellate court held that trial court should have granted petition for termination of maintenance).

Having established that the modification provisions of the current statute apply, it is now possible to resolve a specific claim made by plaintiff. Her specific claim is that the trial court improperly found that she had a duty to seek employment. The factors to be considered in making an award of maintenance (Ill. Rev. Stat. 1985, ch. 40, par. 504) are applicable to modification proceedings. (*In re Marriage of Henzler* (1985), 134 Ill. App. 3d 318, 323, 480 N.E.2d 147, 150; Ill. Ann. Stat., ch. 40, par 510(a), Historical and Practice Notes, at 699 (Smith-Hurd 1980).) Among those factors is "the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment." (Ill. Rev. Stat. 1985, ch. 40, par. 504(b)(2).) Thus, the statute provides for consideration of the time that will be necessary for a spouse receiving maintenance to be able to prepare for employment.

■ In addition, it is by now well established that the statute places an affirmative obligation on the party receiving maintenance to seek appropriate training and skills to become financially independent in the future. (See, *e.g.*, *In re Marriage of Ingrassia* (1986), 140 Ill. App. 3d 826, 835, 489 N.E.2d 386, 392; *In re Marriage of Henzler* (1985), 134 Ill. App. 3d 318, 322, 480 N.E.2d 147, 149; *In re Marriage of Lasota* (1984), 125 Ill. App. 3d 37, 41, 465 N.E.2d 649, 652.) Moreover, it has been said:

> "The failure of the petitioner to make good-faith efforts to achieve this goal, following a reasonable time frame during which the objective should be accomplished, might form the basis for a petition for modification pursuant to section 510(a) of the Act. [Citations.]" (*In re Marriage of Mittra* (1983), 114 Ill. App. 3d 627, 635, 450 N.E.2d 1229, 1234.)

(See Ill. Rev. Stat. 1985, ch. 40, par. 510(a).) Thus, the finding that plaintiff had a duty to seek employment was proper.

Although it is not entirely clear from her brief, it appears, from plaintiff's argument of point I. B. in her reply brief, that all of her claims with respect to maintenance are based upon her having a contract right to it under the settlement agreement, which the trial court failed to enforce. If so, the foregoing has disposed of plaintiff's contentions.

We would note that if plaintiff were challenging the sufficiency of the counterpetition and of the evidence under the current statute, she

would nonetheless not be entitled to prevail.

With respect to termination of maintenance, the counterpetition alleged:

"1. That the Defendant has been paying maintenance, child support or unallocated maintenance and child support since May of 1975.

2. That the minor child of the parties will be emancipated in March of 1986.

3. That the plaintiff, THERESE L. INGRASSIA, is an able-bodied person educated and equipped to be gainfully employed and that she is no longer in need of maintenance.

4. That if the request for payment of college expenses is granted, that the Defendant's sole responsibility should be for the education of the minor child.

5. That the Plaintiff, THERESE L. INGRASSIA, has engaged in a course of conduct over the last ten years which has dissipated the assets of the Defendant making him unable to continue to pay maintenance.

6. That the Court has previously indicated that when the minor child of the parties attends college, there was the belief that maintenance should be terminated.

7. That there has been substantial change in circumstances since the date of the original Judgment for Dissolution of Marriage herein, and that the Defendant should no longer be obligated to pay maintenance to the Plaintiff."

This was sufficient to allege the change in circumstances necessary to modify maintenance and to allege grounds for termination.

Initially, it should be noted that defendant was paying unallocated child support and maintenance under the 1984 order. The 1986 order that he pay for Jacqueline's college education included amounts for room, board, and spending money, so her support was largely taken care of under that provision. In addition, the new financial obligation of more than $9,000 a year under that order required that the unallocated maintenance and child support be reconsidered. Moreover, the allegations of the counterpetition with respect to plaintiff's ability to work sufficiently raised the issue of whether she was violating her duty to seek employment. (See, *e.g., In re Marriage of Ingrassia* (1986), 140 Ill. App. 3d 826, 835, 489 N.E.2d 386, 392; *In re Marriage of Mittra* (1983), 114 Ill. App. 3d 627, 634-35, 450 N.E.2d 1229, 1234.) The petition thus sufficiently alleged grounds for modification of the maintenance order at issue.

With respect to the sufficiency of the evidence, we note the court's

findings:

"The Court finds the following facts based on the evidence:

\* \* \*

9. The 1984 order contemplated that support would cover Jacqueline's educational needs, among other things, and that in equity David should not be required to pay over $9,000 annually in addition to the amounts previously ordered.

\* \* \*

11. Therese's belief that she cannot obtain employment in Rockford due to vilification of her by David and his family and friends has dissuaded her from making objectively reasonable efforts to obtain employment in the Rockford area since 1984. This belief is wholly unsupported by the evidence. This assertion was made by Therese on direct examination, and no witnesses were called to substantiate the claim. On cross-examination, she only named one specific individual (Jay Hart) as having heard defamatory remarks and could not relate the substance of any specific conversation except in vague terms.

She also related an incident at the country club concerning charge accounts. The Court finds David's testimony credible in explanation, especially considering Therese's lack of firsthand knowledge of Jacqueline's charges on his charge account.

The Court considers Therese's view of David's "involvement" in a citation to discover assets brought by one of Therese's judgment creditors as indicative of the unreasonableness of her testimony concerning vilification. Rather than considering the incident as an annoyance to both herself and David, Therese views it as a denial by David of some rights to which she feels she was entitled.

It is inconceivable to this Court that David would intentionally do anything which would make it more difficult for Therese to become gainfully employed and thereby lessen his financial obligations.

12. Over the last two years, Therese has been far too selective in seeking employment, and her efforts to obtain employment or training have been far too sporadic or casual to qualify as an objectively reasonable effort to achieve financial independence as required by law. Eleven years after the divorce and two years after the last order, no progress has been made. An example to which the Court is referring is Therese's failure to recontact Rex Parker after a 1981 job discussion. Another example is her failure to contact the Chamber of Commerce due to

her feelings about vilification by David or his friends and family.

13. Therese has three years of college education, marketable aptitudes in sales, public relations, franchising, and analytical work. She will no longer have custody of a minor child as of March 13, 1986, and will have no reason to worry about her daughter's education since Jacqueline started college in September, is receiving excellent grades, and David is footing the entire bill.

14. Therese since 1985 has been suffering from spastic colitis. This condition should have been under sufficient control by now and can be under control in eight weeks if Therese follows her doctor's advice.

15. Therese suffers from mental and physical exhaustion. This has gone on since the summer of 1985, and Therese reports it has been a problem off and on since 1981. The Court finds as a fact that the primary cause of this illness is the stress caused by the fact that Therese is convinced that David is leading a life of luxury while depriving her and her daughter of their proper social standing, financial support, and even necessities. This stress is self-fulfilling and self-perpetuating.

Reliance on this condition as a reason to deny termination of maintenance would amount to an indefinite abrogation of the obligation to try to secure financial independence. Continued maintenance will be counterproductive to the goal of the law. The course of the last two years demonstrates conclusively to the Court that further maintenance after Jacqueline reaches majority will only perpetuate Therese's financial dependence on David indefinitely. Under these circumstances, 11 years of maintenance is enough."

Plaintiff seems to disagree particularly with the trial court's findings regarding her medical condition and her efforts to obtain employment.

■ A court of review is reluctant to interfere with a trial court's exercise of discretion in awarding maintenance, and will not overturn a maintenance order absent an abuse of discretion. (*In re Marriage of Ingrassia* (1986), 140 Ill. App. 3d 826, 832-33, 489 N.E.2d 386, 391.) The questions of how long it would take for plaintiff to become healthy enough to be employed, and of the sufficiency of her prior efforts to obtain employment, were in some respects close. However, we cannot say on the record of this case that the trial court abused its discretion in finding as it did, or in ordering maintenance terminated at the end of March 1986. The termination of maintenance at that time must therefore be affirmed.

■ The next issue raised concerns the propriety of the trial court's order setting out defendant's financial obligations with respect to providing Jacqueline with a college education. Plaintiff argues that the court erred in limiting defendant's obligation to providing sums whose limits the court set by reference to Mundelein College and in limiting that obligation to full-time study as an undergraduate for four years. There is no error in the trial court's order.

We would first note that entry of an order defining defendant's obligations in this regard was prudent in light of the past history of this case. There had been disputes over Jacqueline's education for several years, with plaintiff ultimately enrolling Jacqueline, without previously informing defendant, at Lake Forest Academy, the most expensive boarding school for girls of Jacqueline's age in the State of Illinois. (See *In re Marriage of Ingrassia* (1986), 140 Ill. App. 3d 826, 829-30, 489 N.E.2d 386, 389.) A similar situation occurred with respect to college. When Jacqueline was a year short of receiving her high school diploma, plaintiff and Jacqueline enrolled her at Mundelein College, a private college in Chicago which would accept her based on her academic ability despite her lack of a high school diploma. Plaintiff then filed an emergency petition for college expenses, which was the first pleading filed in the instant case. Given the long-standing inability of the parties to agree on matters relating to Jacqueline's education, and the past history of plaintiff's enrolling Jacqueline at a school and only then seeking to have defendant ordered to pay for the school, it was certainly prudent to set out in detail defendant's obligations with respect to Jacqueline's college education.

We would also note that plaintiff did not claim in the trial court, and provided no evidence, that Jacqueline wished to go to another, specific, more expensive school, nor did she claim that Jacqueline's interests and abilities suited her for a program of study she wishes to pursue which is only offered at more expensive schools. Rather, plaintiff argues solely for Jacqueline's freedom of choice of a school to attend at her father's expense.

Plaintiff's position is basically that defendant should be required to pay the cost of whatever education Jacqueline wants, wherever she wants to get it, for however long she wants, on whatever basis (full- or part-time) she wants. Plaintiff sees the provision of the settlement agreement relating to Jacqueline's college education as obliging defendant to make unlimited expenditures on whatever Jacqueline wants in the way of an education. She also argues that application of a provision of the Illinois Marriage and Dissolution of Marriage Act providing for education and maintenance of children (Ill. Rev. Stat. 1985,

ch. 40, par. 513) leads to the same result. Neither the settlement agreement provision nor the statute cited supports reversal of the trial court's order specifying defendant's obligations with respect to Jacqueline's college education.

The applicable provision of the settlement agreement reads:

> "9. EDUCATION OF THE CHILD That the Husband shall pay for the college education of the minor child of the parties provided that, at that time, the child has the desire and aptitude for a college education."

Nobody questions Jacqueline's "desire and aptitude for a college education," and she is now enrolled in college, so defendant's obligation to pay for her college education is now effective. The question at bar concerns how much defendant is obligated to pay under this provision.

The provision does not, contrary to plaintiff's position, entitle Jacqueline to an "unlimited" college education at defendant's expense. Nor does it provide that defendant will provide Jacqueline with a college education at the least expensive school of defendant's choosing. The provision is simply silent on the question of how expensive a college education defendant was to provide for Jacqueline.

■■ The provisions of a settlement agreement are to be interpreted by normal contract rules. (*In re Marriage of Kloster* (1984), 127 Ill. App. 3d 583, 584, 469 N.E.2d 381, 383.) When parties to a contract have been silent as to a price term, it will be implied that they have intended a reasonable price. (*Victory Memorial Hospital v. Rice* (1986), 143 Ill. App. 3d 621, 623, 493 N.E.2d 117, 119; *Protestant Hospital Builders Club v. Goedde* (1981), 98 Ill. App. 3d 1028, 1031, 424 N.E.2d 1302, 1305; J. Calamari & J. Perillo, Contracts sec. 2—13, at 45-46 (2d ed. 1977).) The term missing from the settlement agreement's college education provision is essentially a price term, so a reasonable price is implied.

The trial court considered detailed evidence with respect to the cost of attending Mundelein College, the school Jacqueline was attending. Plaintiff presented no evidence from which it could be concluded that some more expensive school's costs should be the standard for a reasonable price. On the evidence presented, the trial court ordered:

> "2. Beginning November, 1985, so long as Jacqueline is a full-time undergraduate student at Mundelien College, David shall pay directly to Mundelein College the following expenses of Jacqueline as they are billed (less any amounts covered by scholarships or similar stipends): tuition, materials and lab fees (if applicable), activity fee and student life fee, room and board (at multiple room rate).

3. In addition, so long as Jacqueline is a full-time undergraduate student at Mundelein, David shall pay directly to Jacqueline the cost of required books and supplies for her classes. The annual amount shall be the amount listed each year in the estimate sent to parents by Mundelein College ($350 for the current year) unless Jacqueline presents him with written documentation of required books and supplies in excess of that estimate, in which case he shall pay the extra amount required.

4. In addition to the support stated above, beginning in April, 1986, David shall pay $120 per month (including summer months) so long as Jacqueline is a full-time undergraduate student at Mundelein. Payment shall be made directly to Jacqueline. These payments shall be deemed as payments under Section 513 for college-related needs such as clothes, entertainment, laundry, transportation, and food not covered by board. Jacqueline shall be responsible for allocating these funds.

5. Nothing in this order shall be deemed to require reimbursement to David of the sums paid to Mundelein and for books in 1985 before the effective date of this order, nor shall they be credited toward the $120 per month ordered.

6. In the event that Jacqueline transfers to another full-time undergraduate college, the provisions of this order shall apply to payments of the same items at that school, but David shall not be responsible for paying more in total than he would have paid had Jacqueline remained at Mundelein. David shall not be required to pay for expenses incurred in transferring, such as moving costs, transportation, transcripts, or application fees.

7. This order shall not be construed to require David to pay for college education beyond the undergraduate level, nor beyond four years from Jacqueline's entry at Mundelien, nor does it apply if Jacqueline ceases to be a full-time undergraduate student in good standing."

Because only plaintiff has appealed, the question really is whether these portions of the trial court's order must be reversed for setting an unreasonably low price.

■ The order cannot be faulted for setting too low a price, particularly in light of the lack of evidence of the reasonableness of some higher price for a college education. Under the order, defendant is to pay all of the tuition, room, board, and other expenses necessary to attend Mundelein College. He is also to pay Jacqueline $120 per month year-round for other of her expenses. This order, requiring defendant to pay the full cost of his daughter's attendance and residence at the

private college in which she had enrolled, cannot be said to set an unreasonably low price.

We note that the other provisions are also reasonable. The limitation to four years of full-time undergraduate study merely represents a reasonable interpretation of what is meant by a "college education." Given the dearth of evidence that any more expensive school's expenses would be a reasonable amount, setting the costs of Mundelein College as the ceiling on defendant's obligations was proper. Moreover, setting a ceiling and making it clear that defendant was not obligated to pay any additional expenses if Jacqueline transferred made defendant's expenses under the order more predictable while leaving Jacqueline free to attend another school if she chose. The requirement of written documentation of books and supplies expenses in excess of the amount estimated by Mundelein was reasonable. Defendant still must pay the full amount of these expenses, but Jacqueline must document them if they are unusually high. Finally, there is nothing unreasonable with setting the room and board amount at the "multiple room rate."

The statute on which plaintiff's alternative argument is based reads in part:

> "The Court also may make such provision for the education and maintenance of the child or children, whether of minor or majority age, out of the property and income of either or both of its parents as equity may require, whether application is made therefor before or after such child has, or children have, attained majority age. In making such awards, the court shall consider all relevant factors which shall appear reasonable and necessary, including:
>
> (a) The financial resources of both parents.
>
> (b) The standard of living the child would have enjoyed had the marriage not been dissolved.
>
> (c) The financial resources of the child." (Ill. Rev. Stat. 1985, ch. 40, par. 513.)

Under this statute, the question of whether and how much a party should provide for a child's post-high school education is addressed to the trial court's discretion. (*In re Support of Pearson* (1986), 111 Ill. 2d 545, 551, 490 N.E.2d 1274, 1277.) A trial court's judgment in this regard will be affirmed if it was not against the manifest weight of the evidence. (*In re Support of Pearson* (1986), 111 Ill. 2d 545, 552, 490 N.E.2d 1274, 1277-78.) The trial court's order in the case at bar was not against the manifest weight of the evidence.

The statute requires the trial court to "consider all relevant factors which shall appear reasonable and necessary." (Ill. Rev. Stat.

1985, ch. 40, par. 513.) The discussion of the reasonableness of the limitations placed on defendant's obligations in connection with the settlement agreement applies here as well. In addition, the order clearly takes into account "[t]he financial resources of both parents" (Ill. Rev. Stat. 1985, ch. 40, par. 513(a)) since defendant is required to pay for all of Jacqueline's educational expenses and "[t]he financial resources of the child" (Ill. Rev. Stat. 1985, ch. 40, par. 513(c)) since the record makes clear that all Jacqueline was to contribute was additional amounts for spending money from summer employment. Plaintiff argues that if the parties had stayed married Jacqueline would have been able to attend any college she chose. This is not apparent from the record since defendant's income, although good (about $77,000 per year at the time of the hearing plus director's fees which had totalled $6,000 the previous year), was by no means so great as to permit the conclusion that Jacqueline would have been able to attend any college no matter how expensive. Indeed, that conclusion would not necessarily be drawn even if her parents had unlimited means, since parents may decide not to permit their children to go to the most expensive college available at the parents' sole expense for reasons unrelated to the ability of the parents to afford it. Under the circumstances, on the evidence which was presented, Jacquline's attendance at Mundelein College was completely consistent with the standard of living she would have enjoyed had the marriage not been dissolved. (Ill. Rev. Stat. 1985, ch. 40, par. 513(b).) Therefore, the trial court's judgment, considered under section 513, was not against the manifest weight of the evidence.

Thus, under the settlement agreement, defendant's obligation to pay for Jacqueline's college education is limited to a reasonable price. The trial court's order set his obligation at a price which was not unreasonably low and so must be upheld on a contract theory. Moreover, under the statute plaintiff cites, the trial court's order was not against the manifest weight of the evidence. Therefore, that portion of the trial court's order concerning Jacqueline's college education must be affirmed.

Plaintiff's final argument in No. 86—462 is that she "was denied due process of law, not only because the decision was predetermined for want of a triable issue but, also, because the tribunal was partial to the point of reaching conclusions of law contrary to its finding of fact." There are two facets to this claim. The first is that the trial court predetermined the case, and the second is that the court's partiality resulted in its deciding the case without the support of the law or the evidence.

■ The second facet may be disposed of by reference to the discussion of the other issues in No. 86—462. As was shown there, the law supports the trial court's order, and the court's decision was not against the manifest weight of the evidence. Thus, the facet of this claim that "the tribunal was partial to the point of reaching conclusions of law contrary to its finding of fact" is without merit.

The first facet of the claim is based upon remarks of the court at the hearing held March 15, 1984, which were incorporated as a finding in the court's order of June 28, 1984. The court found:

> "12. That maintenance shall not be terminated at this time, but if the circumstances at the time of the review [when Jacqueline reached eighteen or completed high school] are the same as they were on March 15, 1984, maintenance should be terminated."

According to plaintiff, this shows that the trial court had predetermined the question of terminating maintenance prior to the hearing at bar. This is incorrect. The trial court specifically stated that this order did not indicate that the case had been predecided or even that the burden of proof would be shifted to plaintiff. As the court stated, it did "not come with any decision in mind just waiting to make it. I intend to base my decision on the law and the evidence. I realize Mr. Ingrassia has the burden of proof concerning change of circumstances that would justify reduction in maintenance." Thus, the claim that the trial court predecided the issue is without merit.

We make two final notes regarding the claim that the court predecided this case. First, because the statute provides that "[t]he maintenance order shall be *** for such periods of time as the court deems just" (Ill. Rev. Stat. 1985, ch. 40, par. 504(b)), it would appear that the trial court in 1984, had it chosen, could have ordered that maintenance be terminated at the time Jacqueline reached the age of 18 or completed high school. Then, plaintiff would have had the burden ·of proving a substantial change in circumstances justifying modification of the order if she sought maintenance beyond that time. (Ill. Rev. Stat. 1985, ch. 40, par. 510(a).) The way the 1984 order reads, and the trial court's statement that defendant had the burden of proof, clearly indicates that the court in 1984 was not ordering that maintenance be at an end at the indicated time, even though the court could have so ordered. Second, if the court had made no such statement in 1984, the subsequent order terminating maintenance on the basis of plaintiff's failure to make good-faith efforts to achieve financial independence might have been open to criticism on the ground that she had never been told that she must do so, and so had not been given "a reasonable

time frame during which the objective should be accomplished." (*In re Marriage of Mittra* (1983), 114 Ill. App. 3d 627, 635, 450 N.E.2d 1229, 1234.) We cannot fault the trial court for warning plaintiff in 1984 of the likelihood that maintenance would be terminated when Jacqueline was 18 or completed high school. Rather than indicating prejudgment of the case by the trial court, we believe the warning was a statement necessary in order to treat plaintiff fairly with respect to the termination of maintenance.

There was therefore no reversible error committed in No. 86—462, and the circuit court's order in that case will be affirmed.

Appeal No. 86—461 involves a dispute between plaintiff and her former attorney, Dan Walker, Jr., over attorney fees. It is again somewhat difficult to pinpoint the precise issues plaintiff is raising, because the issues noted (four in number) do not correspond well with the points (two in number) or the argument under the points. It appears, however, that plaintiff essentially argues that: (1) she was denied due process of law because she received insufficient notice of what she was required to defend when she received the petition for attorney fees on the date of the hearing; and (2) the evidence was insufficient to support the attorney fees ordered by the trial court. We reverse the attorney fees order of the court and remand for a new hearing.

We first address the sufficiency of the evidence claim. Plaintiff claims that "the trial court err[ed] in granting full relief to the attorney against the plaintiff without 'considering the financial resources of the parties' " and that "the court below err[ed] in awarding attorney's fee [sic] on a time-only basis without evidence being introduced of the work performed." Plaintiff did not make these contentions in the trial court. They have therefore not been properly preserved for appellate review, and we will not consider whether the evidence was sufficient to support the award of attorney fees. *Brenkman v. Belmont Marketing, Inc.* (1980), 87 Ill. App. 3d 1060, 1065, 410 N.E.2d 500, 505.

Plaintiff's other claim in appeal No. 86—461 is that she received insufficient notice of the contents of attorney Walker's petition for fees. Plaintiff has cast this as a due process claim. However, the issue may be resolved on statutory grounds, and so we need not reach the constitutional question.

A brief summary of the relevant facts will facilitate discussion of this issue. On April 24, 1986, attorney Walker and plaintiff were present at a hearing. Attorney Walker made a motion for leave to withdraw as plaintiff's counsel, which was granted. He also asked leave to file a petition for fees within 7 to 14 days and to have that petition set for a hearing shortly thereafter. The trial court set the pe-

tition to be heard on May 1, 1986, and attorney Walker was to get a copy of the petition to plaintiff as soon as possible.

Plaintiff and attorney Walker were again present in court on May 1, 1986. Attorney Walker stated that his office had sent plaintiff a copy of the petition by regular mail and another copy by certified mail. The receipt card for the certified mail had not yet been returned to him. Plaintiff stated that she had not received the petition yet. She had called the circuit clerk's office as late as the preceding afternoon (April 30, 1986), but the petition had not been filed, so she could not view it at the clerk's office. She requested time to see and respond to the petition.

A copy of the petition was made and given to plaintiff. After reviewing it, she continued to request time to respond. She stated that she had seen some of the bills attached to the petition, but was not sure whether she had seen others. She needed time to go through her own records at home to compare what she had with what was attached to the petition in order to respond properly. The trial court and attorney Walker were willing to permit plaintiff more time on May 1, 1986, but not to continue the matter to a later date. Plaintiff said she needed more time than just that afternoon to prepare. The court accordingly took her request as one for a continuance beyond that day, and denied the request.

Attorney Walker's petition for attorney's fees was filed on May 1, 1986. It was 16 pages long, including a 13-page exhibit which consisted of copies of bills allegedly sent to plaintiff from February 8, 1985, through April 21, 1986. The bills reflected hours worked on various tasks, costs advanced, payments (four totalling more than $1,300), and current total due. The final bill indicated that the final total due was $11,730.08. No proof of service of the petition appears in the record.

The trial court conducted a hearing on the petition on May 1, 1986. After considering evidence, which included testimony from attorney Walker, and attorney Walker's time slips, the court entered judgment for attorney Walker in the amount of $9,730.08. The $2,000 difference between the amount of the judgment and the total due attorney Walker represented the amount of plaintiff's attorney fees defendant was ordered to pay at the separate hearing.

The applicable statute provides:

> "The court ***, after due notice and hearing, *** may order either spouse to pay a reasonable amount for his own costs and attorney's fees ***." (Ill. Rev. Stat. 1985, ch. 40, par. 508(a).)

The issue at bar requires us to decide whether plaintiff received "due notice." To do that, it is necessary first to determine when plaintiff

should be deemed to have been served with the petition.

Attorney Walker, at the May 1, 1986, hearing, stated that his office had sent plaintiff two copies of the petition on April 25, 1986; one by regular mail and the other by certified mail. He had not received the registry receipt from the one sent by certified mail, and plaintiff stated that she had received neither copy.

■■ Service of a document by certified mail is generally complete when the party to whom it is addressed receives it, and the registry receipt is evidence of its receipt by the party. (See 87 Ill. 2d R. 105(b)(2).) Plaintiff denied receiving the copy of the petition sent by certified mail, and attorney Walker was unable to present the court the registry receipt or any other evidence that plaintiff had received it. Plaintiff therefore cannot be deemed to have been served with the copy sent by certified mail.

■■ With respect to the copy sent by regular mail, it appears that the following provisions in the supreme court rules govern:

"Pleadings subsequent to the complaint, written motions, and other papers required to be filed shall be filed with the clerk with a certificate of counsel or other proof that copies have been served on all parties who have appeared and have not therefore been found by the court to be in default for failure to plead." (87 Ill. 2d R. 104(b).)

"Papers [other than process and complaint] shall be served [on parties not in default in the trial court] as follows:

\* \* \*

(3) by depositing them in a United States post office or post-office box, enclosed in an envelope, plainly addressed \*\*\* to the party at his business address or residence, with postage fully prepaid."(87 Ill. 2d R. 11(b)(3).)

"(a) Filing. When service of a paper is required, proof of service shall be filed with the clerk.

(b) Manner of proof. Service is proved:

\* \* \*

(3) in case of service by mail, by certificate of the attorney, or affidavit of a person other than the attorney, who deposited the paper in the mail, stating the time and place of mailing, the complete address which appeared on the envelope, and the fact that proper postage was prepaid:

(c) Effective date of Service by Mail. Service by mail is complete four days after mailing." (87 Ill. 2d R. 12.)

Service of a document by mail is not invalid merely because the party to be served denies receiving it. (*Bernier v. Schaefer* (1957), 11 Ill. 2d

525, 529, 144 N.E.2d 577, 579 ("[i]f the proper giving of the notice can now be frustrated by the mere allegation of the defendant that he did not receive it, then the giving of notice by mail cannot be relied upon even though the rules specify such a method").) Although minor defects will be excused, proof of proper service by mail must be made in substantial compliance with the requirements of Supreme Court Rule 12 (87 Ill. 2d R. 12). *Curtis v. Pekin Insurance Co.* (1982), 105 Ill. App. 3d 561, 566-67, 434 N.E.2d 555, 559; see also *Bernier v. Schaefer* (1957), 11 Ill. 2d 525, 529, 144 N.E.2d 577, 579.

In the case at bar, attorney Walker did not substantially comply with the requirements of Rule 12 for proof of service by mail. In fact, despite Rule 12's statement that "[w]hen service of a paper is required, proof of service shall be filed with the clerk" (87 Ill. 2d R. 12(a)), no proof of service whatsoever appears in the record. There was therefore no compliance with the requirements of Rule 12.

Attorney Walker stated in open court that he personally had placed the copy of the petition in a mailbox the afternoon of April 25, 1986. Assuming *arguendo* that a statement by an attorney in open court could ever substitute for the certificate he is required to file under Rule 12 (87 Ill. 2d Rules 12(a), (b)(3)), the statement of attorney Walker would be insufficient for failure to contain substantially the information required in an attorney's certificate. His statement included the time of mailing, albeit somewhat vaguely, and some nonspecific reference to where it had been sent. It did not state the place of mailing (beyond the reference to a mailbox) or "the complete address which appeared on the envelope, and the fact that proper postage was prepaid." (87 Ill. 2d R. 12(b)(3).) Thus, there was no proper proof that plaintiff was served with a copy of the petition by mail, and we cannot deem service to have occurred on April 29, 1986, four days after the April 25, 1986, mailing. See 87 Ill. 2d R. 12(c).

Attorney Walker in his brief argues that the trial court chose not to believe plaintiff's denial of receipt of the petition. It is questionable whether the trial court could properly have done this on the record at bar, where there was no evidence to contradict her statement. Also, the record does not support this argument of attorney Walker. The trial judge did not indicate that he did not believe plaintiff, and even allowed her a brief period of time to review the petition when she received it at the hearing and appeared willing to allow her additional time on that day to prepare. It thus appears that the trial court took plaintiff at her word, but was nonetheless unwilling to continue the matter beyond May 1, 1986.

It is undisputed that plaintiff received a copy of the petition

in court near the beginning of the hearing on May 1, 1986. Since there is no sufficient proof of service of the petition which would support an earlier date, May 1, 1986, must be deemed the date on which plaintiff was served with the petition.

The trial court was apparently willing to continue the matter to later in the day on May 1, 1986, and plaintiff declined this offer on the basis that the time was insufficient for her to prepare. The specific question presented is whether receipt of the petition a few hours before the latest time the court was willing to hear it was "due notice." In this case, it was not.

█ The petition sought fees based upon 13 pages of billings it alleged were sent to plaintiff over a greater than 14-month period. The total it alleged attorney Walker was entitled to for the services in question was over $13,000, of which more than $1,300 had allegedly been paid. Included in the billings were attorney Walker's indications of what he had done, the hours he had worked, his hourly rates for different kinds of services, the costs advanced, and payments received. The ultimate judgment also took into account $2,000 which defendant had previously been ordered to pay for attorney Walker's services for plaintiff, which was not indicated in the petition. In view of the amount at stake and the relative complexity of the billings to which plaintiff was required to respond, a few hours the day of the hearing was not sufficient notice.

We are sympathetic with the trial court's desire to complete this matter on May 1, 1986. This is particularly true in view of the hardship to attorney Walker involved in requiring him to make an additional trip from his office in Oak Brook to the trial court in Winnebago County. However, plaintiff was nonetheless entitled to due notice, and on the record before this court did not receive it. The order for attorney fees must therefore be reversed, and the cause remanded for a new hearing.

The judgment of the circuit court of Winnebago County in appeal No. 2—86—0462 is affirmed. The judgment of the circuit court of Winnebago County in appeal No. 2—86—0461 is reversed, and the cause is remanded.

2—86—0462 - Affirmed.
2—86—0461 - Reversed and remanded

HOPF and WOODWARD, JJ., concur.